The next case is number 21-2209, Meenaxi Enterprise, Inc. v. The Coca-Cola Company. Okay, Mr. Mandel. Good morning. May it please the court, I'm Richard Mandel of Cowen, Leibowitz & Lattman, and I represent the appellant, Meenaxi Enterprise. The central issue we raise on this appeal is the effect of the territoriality doctrine on a cancellation claim under Section 14.3 of the Lanham Act. As this court and numerous other courts have recognized, the concept of territoriality is basic to trademark law. Under that doctrine, trademarks have a separate existence and goodwill in each country, so that the rights and recognition a mark may have established in one country, such as, for example, in this case, India, do not automatically extend to the United States. The board's decision below ignored that principle by basically relying on evidence that was almost exclusively about Coca-Cola's reputation in its thumbs-up and limp demarks in India and applying that to cancel Meenaxi's U.S. registrations. What about the evidence that the board and the fact findings made by the board showing that there are purchasers in the U.S. who are familiar with the Coca-Cola company's thumbs-up and line cut products and that those products are in fact sold in the U.S. or available in the U.S. So, our position on that is that those findings are not supported by substantial evidence. And I think the clearest way you can see that, you know, Coca-Cola lays out at page 53 of its brief exactly what the bases were for that finding by the board that the reputation would be familiar to most of the Indian American community in the United States. And so let's look at what that is. Well, let's first assume that the board's findings are sustained. I think Judge Stoll was asking, under those circumstances, is there a reputational injury? Well, so there are two questions here that I think we have to look at. I mean, one is, if there is a reputation in the United States, is that enough to state a claim? And that's kind of a difficult question, to be honest, because Coca-Cola doesn't take on exactly what level of reputational recognition is necessary. And, you know, when you think about it, even a famous mark, so a mark that's not used in the U.S. but that has achieved fame here just based on its foreign reputation, is generally not protected in the United States. There is a quibble between the courts on that. The Second Circuit says it's not. The Ninth Circuit says it can be if it's famous. But here, we conceivably don't have that. Coca-Cola says these marks are not famous in the United States. Nobody is claiming that. So there is a difficult question about, you know, some minimal level of recognition among some subset of the population. Is that enough to state a claim under the Lanham Act? That's a tough question. I don't know what the answer is to that. But I don't think we have to get there, because the bottom line is, there is not substantial evidence supporting the finding that there is a reputation here. And if I can return to what Coca-Cola points to there, so it points to five things that it says support it. And four of those things clearly have nothing to do with the United States. So it's the fact that it's registered in India and abroad. Okay, so what? Doesn't mean anybody knows that here. Substantial market share in India. Again, that just means it's popular in India. It doesn't go to its recognition here. Impressive sales numbers is the same thing. There's no sales here in the U.S. that have been authorized by Coca-Cola. Substantial promotional investment is nonexistent in the United States. Because, you know, what they're talking about, they're prominent Hindu movies, Bollywood celebrities, A-list Indian actresses. This is all advertising directed to India. And yeah, they have a couple of websites that technically somebody could access in the U.S. But as this court kind of pointed out in Newbridge Cutlery, that's not enough. I mean, just saying something's on the Internet doesn't establish that people know it or that it's recognized. So really, the only thing that they have to point to is the sales. And let's look at what that evidence actually is. It's gray market goods. It's not goods that Coca-Cola has... Well, that's not quite true. I mean, as to the thumbs-up product that is sold at these two Coca-Cola stores. I guess that after Minoxidil's established its registrations, it's offered in samplings where, you know, if you go into the Coca-Cola exhibit in Atlanta and they have, you know, all the drinks around the world that they offer, somebody could go there and taste it. But it's not being sold... Since it's a fairly relaxed standard for standing, why isn't... Why isn't that sufficient to create a reputational injury? Because I think we're talking about a selection of its foreign markets that... foreign products that are being made available to the public as a point of interest when you go in to see an exhibit. It's not... It's not sales. It's not like they're actually exploiting the product and offering... Well, it is being thumbs-up. It is being sold. It is being... I don't... Whether it's actually being sold, I don't know. The record's a little unclear on that. I think it can be sampled. I know from when I go into Atlanta... You would agree that they're using the thumbs-up mark, might not be registered in the U.S., but they're using it in the U.S. at World of Coca-Cola, right? I don't agree, actually. Well, I mean, I guess if you think that the fact that somebody can go into an exhibit and as an incidental point of interest, they can sample the product while they're at the Coca-Cola exhibit in one location or two locations, I don't know if that's really trademark use. Why wouldn't that type of activity constitute use under the landmark? There's very little that's in there to actually be able to see what it is, that evidence. I mean, we don't... You know, and it's not focused on much by Coke and it's free. It's not a high standard, is it? Well, to establish use, there has to be bona fide use in commerce. I mean, we don't really know much about what they're doing there. I mean, I don't know that you can actually go buy it in a can and take the product. There's no evidence to suggest you can. I think you can get a sampling of foreign drinks and it's one of them there. There's more evidence of use here, at least for thumbs up, than there was in the Balmora case, right? Well, you know, it's an interesting point on Balmora because I think in Balmora, if we're looking at the actual injury point, in Balmora, what the court pointed out is that you had substantial sales in major cities very close to the U.S. and Mexico border and advertising directed at that region. So in terms of... Most Mexican sales in that case. Right. But it was literally right on the border with evidence that people... The difference depending on the location of the country. Well, I think it's relevant because we're talking about injury and what... Even where there's so much global movement. Well, here we're talking about 8,000 miles apart and... But people travel back and forth, right? People travel, but there's no evidence of any substantial sales. I mean, for Lipka, there's no evidence of any sales, really, other than the fact that they put in a couple of affidavits that showed three websites where it looks like the product is shown on the website. We don't have any evidence that any sales were actually made. These are gray market goods, as far as we can tell. We know that one shipment... The only actual sales that they talk about in the record, where there's actual proof of some sales being made with respect to Lipka, is this one sale that took place to Grace Imports that apparently was outside the authorized chain of distribution because the distribution agreement that Coca-Cola put in was limited to India, and apparently one of its distributors sold some small quantity, $1,500 worth of goods that included Lipka and Thumbs Up into the U.S., apparently unauthorized, and it got seized and apparently never was sold to consumers because of Minoxidil registrations. But I don't see how that establishes injury for Coca-Cola. I mean, honestly, most brand owners are trying to stop gray market goods from being sold. If not Coca-Cola, if someone... Who has standing in this case to bring an action under the statute of issue in this case, if not Coca-Cola? Well, I don't think anybody doesn't... Because I don't think there's any violation under the statute. But that's not the requirement. I mean, you have to prove your case before you have to have a case. So if we're talking about standing... I mean, Coca-Cola would be the party theoretically who has standing, but I don't think they do on these facts because in the end, what we're talking about is foreign trademarks, basically. But in the end, what we're talking about, we're talking about misrepresentation of the source of a good. It doesn't matter if the producer of that good has a trademark or not. There's nothing in the statute that talks about that. But I think it matters in this sense. Even Coca-Cola seems to acknowledge... I mean, look, one could take the position that it's enough that you misrepresent the goods by selling a foreign product in the US that's owned by somebody in another country. Coca-Cola seems to be saying, no, that's not the case. The board decision didn't rest on just the fact that we had an Indian trademark. Now, I guess one could read the statute literally and say, okay, it's a misrepresentation of source because the proper source is that Indian mark. But to do that is essentially to ignore the territoriality principle. How is it that the statute is seeking to protect? Is it consumers? It's seeking to protect both consumers and trademark owners. It's only seeking to protect trademark owners? It's not seeking... No, probably... The producer of the good? The public too. But the bottom... But Coca-Cola, I mean, your view is that it's not intended to protect Coca-Cola because Coca-Cola's mark only exists outside the United States. Yes, and that's consistent with... I don't think that's a radical position. If we look at trademark law, I really think it's Belmora that is outside the mainstream when you look at it and look at the territoriality doctrine. The bottom line is that we don't protect marks in the United States based on their foreign reputation, even when they're famous. To say that you should protect a mark that's admittedly nowhere near that level of recognition based on some incidental gray market goods that happen to find their way into the country, where there's no evidence... You're not convinced at all by the evidence that the mark was not famous, but well-known in India and that there is a good percentage of American Indians in the U.S. who are familiar with the product. I think what's lacking is the nexus between the recognition in India and the recognition here in the U.S. Basically, what the board in Coca-Cola is saying is it's well-known in India. There are a lot of Indian Americans. Therefore, it must be well-known to Indian Americans here. But they didn't show that. There's no survey evidence to show that. There's no advertising. There's no promotion here. When you're looking at standing, should inferences be made in favor of the party that's trying to prove standing? Well, I think they need to show that they fall within the zone of interest that Congress was intended to protect. And I don't think that Congress was looking to protect foreign trademark owners with marks that have not established U.S. recognition. And I think there's really no nexus on injury. I mean, if you look at this— This has really come down to whether this is a mark that has recognized U.S. recognition or— I think it does, by Coke's acknowledgement, I would say it does. And the board seems to be saying it, too, because nobody seems to be saying— I don't understand Coke to be saying, it's enough that we own this mark in India. It's well-known in India. We can protect it in the U.S. They're not saying that. Is that the well-known mark doctrine? Right, and that— But wasn't that waived? Yeah, they're not pursuing that. And I think it's waived because they know they can't meet that standard. That's a very high standard. They're not suggesting that their mark is famous in the United States. They're not suggesting that the only way the mark could be known in the United States would be if it were famous, right? No, I'm not. But there is a question, if we're not even willing to protect famous marks in the United States, there's a serious question about what level of recognition is necessary to protect a mark that conceivably is way below that threshold. Where do you come up with the idea that we're not willing to protect marks that are famous? Well, the Second Circumstance Decision in ITC says that— In persons, we seem to suggest that— Right, I think persons— Don't interrupt. Yeah, I'm sorry, Your Honor. Don't interrupt. In persons, we suggested there might be an exception for famous mark. Right. This Court has not decided. There's a split in the circuits between the Second and Ninth Circuits. This Court has not weighed in on that question. But I think persons is very much on point because a lot of what is said in persons is equally applicable here. They're saying, yeah, they took a mark in Japan. They admittedly copied it. They saw it in Japan. They came back. That's not bad faith. That's because there was no U.S. recognition or use here. Coca-Cola's answer to that is, well, that's under Section 2D. But our fundamental point on this appeal is, why should that matter? When we talk about trademarks and you talk about the territoriality doctrine, it goes to the essence of what a trademark is. It defines the scope of protection in a trademark. So just because we're now under 14-3 as opposed to 2D, if this Court is right in persons that that's not bad faith for 2D purposes, I don't see how it can be a blatant misuse under 14-3. Did Coca-Cola ever contact your client subsequent to the registration of the marks in the U.S.? They did to complain about other registrations which have been canceled and voluntarily given up involving specific designs. But they didn't at that time complain about the word marks themselves. So it seems to me there was a four-period time between the registration of the marks to the filing, the cancellation of the marks, four-year period. I believe that's correct, Your Honor. And did they contact your clients about the use of the mark here in the U.S. before that time? Not to my knowledge. I think they complained about specific designs which those registrations have been given up. Thank you, Your Honor. Okay, we'll give you two minutes for remodel. Thank you, Your Honors. May it please the Court. My counsel across the aisle discussed territoriality at length, but he did not put his territoriality argument in the context of what we're talking about in this appeal. This is a misrepresentation claim made under Section 1064 of the Lanham Act. You would agree, wouldn't you, that if there were no U.S. consumers who were aware of the Indian mark, as was the case in Persons, that there wouldn't be no basis for cancellation? With respect to Persons, as we stated in our brief, Persons is an entirely different situation. It's a 2D cancellation action in which... Answer my question. Do you agree that if there were no recognition of the mark, the Indian marks in the United States, that there would be no basis for cancellation? Under misrepresentation, there has to be a blatant misuse in a manner designed to trade on the goodwill of another party. So there has to be, yes, somebody who is familiar with this in order for there to be harm to the consumers or to the mark holders. What about their substantial evidence argument about there not being knowledge of the Indian marks among the Indian American population in the United States? Yes, Your Honor, as you're well aware, substantial evidence is a very low standard and one we readily meet here. What's the substantial evidence? There's multiple pieces of evidence that leads to that conclusion. Number one is that importations are being sent to the U.S. from India. Those are being blocked by the NAAXI. We have plans to distribute ourselves. The fact that there are importations which are blocked doesn't say anything about whether U.S. consumers are aware of the Indian marks. What's the evidence that U.S. consumers are aware of Well, we have, for instance, we have NAAXI, all the principles of NAAXI admitted knowledge. We have customers of NAAXI. There's evidence of NAAXI's own customers commenting that with respect to the marks, they were aware that these were the marks used in India. So we have that type of evidence. There is absolutely substantial evidence. But with respect to this use in commerce requirement. Customers in the United States were aware? Yes. Do you have appendix pages you'd want to cite to us on these? Sure. I will get that for you. Just a moment. Sorry, just give me a moment. Okay. Can my colleague find that for me while I address another point or would you like for me to Were these customers, U.S. customers outside of the Indian community, the American Indian community? They were community. They were members of the U.S. consumer group. I don't know exactly if they were Indian Americans or not, but they were NAAXI's customers in the U.S. who commented on knowledge of the marks and thought that they were the marks they had seen in India. It would be great if you could give us the citation sometime during your argument. Yes, I will. I interrupted you and you were listing the things. You said importations in the U.S., NAAXI's admitted statements, NAAXI's customer statements. What else have you got? We have, as well, the evidence that, again, NAAXI's own witnesses admitted that they were aware of the marks. We have the customers. What witnesses? Excuse me? What witnesses? The principals of NAAXI themselves, the Gandhi. That doesn't say much about U.S. consumers. They could well have been aware of it because Correct. They're our own commercial interests. I want to bring this use in commerce argument back, though, to the court's decision in Australian Therapeutic. In Australian Therapeutic, and it's a case we cited in our briefs, it decided just two years ago, and the court held, and I quote, that neither 1064, which is also known as Section 14, and it's the cancellation statute at issue here, nor our precedent requires that a petitioner have a proprietary right in its own mark in order to demonstrate a cause of action before the board. This is true irrespective of the grounds of non-registrability. But it's irrelevant here. The question is whether there's injury. Correct. And the injury here is not based on lost U.S. sales, as I understand it. It's based on a reputational injury, and if there's no reputation in the United States with respect to these Indian brands, how could there be reputational injury? The reputational injury exists because, again, this is not a mark that is, these are not marks that have just minimal use abroad. These are, especially the Thumbs Up, this is a billion-dollar brand we're talking about. Not a famous mark. Again, what's the evidence? Totally, and I wouldn't think it would be so hard to find. What is the evidence that, given the $1 billion in sales in other countries, Americans would be aware of the product and the marks? The evidence was a reasonable inference made by the board, which was that. And blocked. But for you, what is the underlying evidence? The underlying evidence was the fact that these marks are deemed well-known in India. They would be in judicial decisions. That doesn't say anything about the United States, the fact that it's well-known in India. I mean, that was true in persons, too. The mark was well-known in Japan. So it's deemed well-known in India, combined with some understanding that some American Indians, some American Indians probably are aware of it by having lived in India or visited India. Do I have that right? Yes, but these marks are well-known to a substantial part of Indian-American consumers, and that was an inference the board made based on substantial evidence. We're still waiting for the evidence. Again, one of the, and I apologize, I will find this citation. This isn't a surprise, right, that we're asking about this? No, it's not a surprise. But again, our position is that it's irrelevant because the court's decision in Australian Therapeutic made clear... We're asking you for the substantial evidence. Where's the evidence? The evidence is... Can I... Give me just one minute, because this is very important, and I will find this. Okay. Maybe your colleague can look that up while we go on, because there's still some questions that I have for you. Am I correct that you conceded the famous mark exception rule? The famous mark exception rule goes in hand-in-hand with a 2D claim, likelihood of... Am I correct that you conceded that? 2D is not before the board, yes. We are not arguing for a famous mark exception with respect to misrepresentation. All that Coca-Cola must show in order to meet the misrepresentation statute... The famous mark exception go to the argument you're making about how it's well-known within the Indian community? It's not a famous mark exception because the section of... It's related to it, isn't it? It has some relation, but misrepresentation talks about the actions of the putative defendant. It doesn't talk about the actions of the party seeking to cancel a mark. So again, we're not arguing for a famous marks exception. Again, Australian Therapeutics talks about Lexmark and how you have to meet the Lexmark test in order to be able to be entitled to a statutory cause of action, and we absolutely meet the Lexmark test. Then you go into the actual language of misrepresentation and what we're required to show. So again, what Menaxi is asking the court to bless is the business practice of ripping off brands that are well-known abroad, copying the marks exactly, copying the advertising slogans used for those marks, and selling identical products under those marks in identical trade channels under those marks to U.S. consumers, all the while maintaining federal trademark registrations for such marks and receiving all the rights pertinent thereto. And they do so relying primarily on the person's decision, as my colleague across the aisle talked about. So again, persons is not a misrepresentation claim. The court in persons made clear that there was no evidence of blatant misuse of the marks or any bad faith. This is a different situation there. And specifically, another point Menaxi ignores in its briefs, in Australian Therapeutics, the court pointed out a distinction between Section 1064 claims like we're dealing with are necessary to show priority of use when petitioning. That's not their argument. They're not arguing that there have to be, that COPA has to have proprietary rights in the United States. They're arguing there's no sales injury, which you're not even claiming, and that there's no reputational injury, because this is not a, Indian marks are not even known in the United States. They actually do argue at length about proprietary rights, and sometimes they argue it has to be a priority of use. Sometimes they just say use it for- I think we agree with you on that. We agree with you. Okay. But the concern we have is that are there consumers who are familiar with your goods so that their expectations would be upset when they encountered Menaxi's goods? So, yes. Again. Okay. Thank you. Certain appendix sites, we have appendix 3048, 3050- Wait, wait, wait. 3048. And what is that on 3048? This is the Dasani declaration. Is that right? Yes, those are the declarations. And what are you relying on this for? It shows that Toca-Cola's products are known among Indian Americans. Where does it say that? Where is that? There's multiple portions of it, so if I can point to several portions. People come up here and they say it's in there somewhere. That doesn't satisfy us. We want to see exactly where it is. Okay. Thank you. Unless my colleagues have further questions, why don't you reserve the rest of your time? Yes, thank you, Your Honor. While we're hearing further from Mr. Mandel, you can see if you can find something. Thank you, Your Honor. I'll find it. Do you have any idea what they're talking about? Yeah, I think, Your Honor, I think the citation they're looking for is appendix 2861 to 2862, in which one Minoxi witness indicated having seen the Thumbs Up, but not the Limca brand in India. So the evidence that we're talking about here is, yes, there's one 2861 to 2862, that as to Thumbs Up, there is evidence in the record that one consumer had once indicated to Minoxi that they had heard of Thumbs Up. But that's just not substantial evidence. I think the thing is, when you really look, and I think the reason... Oh, yeah, in persons, there was one person also, right? I don't recall, but the point is, the fact that it's taking them this long to find, it almost speaks to what the evidence is, how there is no substantial evidence. We're talking here about a statement by one of the Koch's witnesses who just says it, just says it's well known in the U.S., doesn't even indicate how he would know. He says he's familiar with recognition in India, not the United States, so... Well, I hear what you're saying. I just want to make sure my question is answered. I have a question. Okay, sure. Why is it that the fact that March and the product is well known in India? Let's take that. I think there's probably substantial evidence to support that. Yes. And then there is some evidence put into the record about the number of Indian-Americans and how that population has been growing throughout the years in America. And then it's circumstantial. I think their position is, you take the well-known trademark in India, you combine that with the fact that there's many, many people moving to America, living in America from India, so they must know about the mark. Why isn't that a fair bit of circumstantial evidence to support the board's finding? I think it's just too big a leap of logic is the answer. To say that there are a lot of Indian-Americans, so therefore... I mean, we don't know what percentage of them have been to India, visit India, what percentage of them shop in Indian grocery stores. And even if they do shop in Indian grocery stores, they're not going to find Coke's product there, because it's basically... There's no evidence of any substance to show that the product has any U.S. presence. They found three websites. Let's be honest here. This is Coca-Cola. They have a lot of resources. The fact that they scraped together three websites that show the product, obviously, almost in and of itself tells you that there's not a substantial reputation here. Do they have a burden to show a nexus between that data? I'm sorry, Your Honor? Do they have a burden to show a nexus between the data and whether it's well-known and how that relates to India? I think they do, because otherwise, what would there be? There are a lot of marks that may be well-known as foreign marks. In Pearson's, I'm sure there are a lot of Japanese-Americans also. But that's not enough. We don't even protect famous marks. And now we're talking about protecting a mark that may be known, which hasn't been shown, but we're assuming and firing that it may be known to some small subset of the American population. I just don't see how that's enough to state a claim under the existing law. And even putting aside, I know they're talking a lot about the Australian case, which only goes to the standing question. There is still the merits at the end of the day. And on the merits, I really just don't see that they've established a misrepresentation. I think Pearson's really is on point here. I don't think it's an answer to say that's a Section 2D case, because the court is talking about bad faith. And they're saying out loud, it's not bad faith to adopt a mark in the U.S. that you've seen in Japan, that has a presence in Japan, because there's no goodwill here in the U.S. Trademarks are territorial. That applies every bit as much if we go on to 14.3 as it does under 2D. Okay. Unless my colleagues have further questions, I think we're finished with your argument, but we'll give Ms. Saperito a chance to show us where in the record there is support for this finding. Yes, Your Honor, and thank you for that opportunity. It was, my colleague was, across the aisle was correct. It's Appendix 2861, specifically at 132.7-13, testimony from one of the Menaxi witnesses. Okay. That's it? That's the record site Your Honor was looking for. But again, given Australian therapeutics... Okay, no, we're not looking for further argument in there. Thank you. Okay, thank you. Thank both counsel. The case is submitted.